Filing # 107855637 E-Filed 05/22/2020 12:07:33 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:
DIVISION:

**BRENDA L. LANDON,** and
**RESTITUTO A. LANDON, her husband,**

       Plaintiffs,

v.

**ALLERGAN SALES, LLC,**
**a foreign limited liability company**, and
**RICARDO E. MOJICA,**

       Defendants.

_____/

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

The Plaintiff, **BRENDA L. LANDON** and **RESTITUTO A. LANDON, her husband**, sue the Defendants, **ALLERGAN SALES, LLC, a foreign limited liability company**, and **RICARDO E. MOJICA**, and allege the following:

**GENERAL ALLEGATIONS**

1.     This is an action for damages in excess of $30,000, exclusive of attorney's fees, costs, and interest.

2.     All conditions precedent to the filing of this action have been performed or have occurred.

3.     At all times material hereto, the Plaintiffs, **BRENDA L. LANDON** (hereinafter "Ms. Landon") and **RESTITUTO A. LANDON** (hereinafter "Mr. Landon"), were and are residents of, and permanently domiciled in, Fernandina Beach, Nassau County, Florida.

ACCEPTED: DUVAL COUNTY, RONNIE FUSSELL, CLERK, 05/22/2020 12:46:01 PM

4.     All medical care and treatment rendered to Ms. Landon upon which the claims set forth herein are based took place in Jacksonville, Duval County, Florida.

5.     The Defendant, **ALLERGAN SALES, LLC** (hereinafter "Allergan"), is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

6.     Allergan is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

7.     Allergan may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

8.     At all times material hereto, the Defendant, **RICARDO E. MOJICA** (hereinafter "Mojica") was and is a resident of, and permanently domiciled in, the State of Florida, to-wit, at 2425 Northwest 26th Street, Boca Raton, Palm Beach County, Florida.

9.     Allergan and Mojica's co-conspirators, whom Allergan and Mojica aided and abetted, were: (i). Loren Z. Clayman, M.D. (hereinafter "Clayman Senior"); (ii). his son, Mark A. Clayman, M.D. (hereinafter "Clayman Junior"); (iii). and their medical professional association, Loren Z. Clayman, M.D., P.A. (hereinafter the "Clayman Practice"). Hereinafter, Allergan and Mojica's co-conspirators will be collectively referred to as the "Claymans."

## FACTUAL ALLEGATIONS

10.     For at least 15 years, Allergan has known that Clayman Senior, Clayman Junior, and the Clayman Practice were lying to hundreds of female patients by telling them they had

ruptured, deflated, or leaking saline breast implants so the Clayman Practice could collect free implants and surgical fees for replacement surgeries. Allergan knew the Claymans were lying because: (1). Allergan's own Southeast Regional Sales Director, Mojica, individually and through the sales representatives working under him, first proposed to, and repeatedly encouraged, his Florida plastic and cosmetic surgery customers (including the Claymans) to lie to their patients and on breast implant warranty claim forms about the condition of saline implants in order to obtain free breast implants and surgical fees; (2) As Allergan received a breast implant warranty claim form signed by the patient and Clayman Senior or Junior for each warranty claim made by the Clayman Practice, Allergan was aware that the Clayman Practice was lying to its patients about the condition of their breast implants; (3). for each warranty claim made by the Clayman Practice, Allergan examined the implants at issue and found that they were not defective; and (4). the Clayman Practice's saline breast implant failure rate was markedly higher than the failure rate of 1.5% for each year after surgery that Allergan's own studies of its saline breast implants showed.

Despite this knowledge, Allergan paid every saline breast implant warranty claim made by the Clayman Practice—5,278 claims—between January 1, 2006 and December 31, 2015. Allergan paid these claims because the Clayman Practice purchased large quantities of breast implants, other medical devices, and pharmaceuticals from Allergan, and Allergan wanted to encourage and promote the Clayman Practice's continued purchase of their products. As demonstrated by the multiple criminal and civil proceedings against Allergan within the past 10 years, it is apparently an integral part of Allergan's marketing plan to pay (bribe) physicians to use its products. For these reasons, Allergan and Mojica are liable to Ms. Landon for aiding and abetting and conspiring with Clayman Senior, Clayman Junior, and/or the Clayman Practice.

### Allergan and McGhan/Inamed

11.     Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants.  In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

12.     In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed.  The new company's breast implants were still labeled McGhan breast implants.  By this time, the company was one of the largest breast implant manufacturers in the world.

13.     In March 2006, Inamed merged with Allergan, a multinational manufacturer of healthcare products in many different categories, including the following:  dermatology, central nervous system, eye care, women's health and urology, gastroenterology, cardiovascular diseases, infectious diseases, and aesthetics.  Among Allergan's products are Botox (therapeutic and aesthetic), Namenda, Restasis, Linzess, Bystolic, Juvederm, Latisse, Loestrin, Estrace Cream, Teflaro, Dalvance, Ozurdex, Optive, Viibryd, Liletta, and Saphris.  After the merger with Inamed, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

### Allergan's Breast Implant Warranty Scheme

14.     After the merger, Allergan created Allergan Partnership Privileges (hereinafter "APP").[1]  APP provided members with rebates, sales growth rewards, a special online physician locator listing, priority customer service line access, preferred shipment status, and certificates and status displays; the purposes of APP was to leverage sales across its entire line of aesthetic products.  To become an APP Partner, a medical practice had to purchase at least three types of aesthetic products:  Botox (one of the company's most profitable products), a dermal filler (i.e.,

---

[1]     As of January 31, 2020, Allergan discontinued the APP.

Juvederm), and breast implants.  APP had several tiers based upon the volume of Allergan aesthetic product purchases:  Bronze, Silver, Gold, Platinum, and Diamond; Diamond tier partners received the highest level of perks from Allergan.[2]

15.    Despite implementing the APP, in most regions Allergan's breast implants sales lagged behind those of its chief competitor, Mentor, which offered breast implants at lower prices.

16.    To increase the volume of breast implants sales, Allergan encouraged and approved regional sales directors in certain regions[3] to direct their sales representatives to expressly offer Diamond tier APP partners incentives that, crossing legal and ethical boundaries, *amounted to kickbacks and bribes*.  In some instances, they offered Diamond APP partners free travel and lavish non-educational parties in exchange for greater breast implant purchases.  In other instances, in exchange for increased breast implant purchases, representatives provided Diamond tier surgeons free implants and surgical fees by allowing them to make false breast implant warranty claims.

17.    In the false warranty scheme, in exchange for higher breast implant purchases, Allergan's sales and marketing representatives (including Mojica and those working for him) expressly directed Diamond tier surgery practices (including the Claymans) to falsely claim implants had spontaneously ruptured, deflated, or leaked so they could receive free breast implants and surgical fees under the warranty.  One effect of this scheme was that it facilitated "cover ups" by certain surgeons who falsely attributed poor breast surgery outcomes to ruptured, deflated, or leaking implants rather than careless surgical practices.   As such, these surgeons

---

[2]    Allergan later added another tier to the top level, Double Diamond.

[3]    Among the known regions where the warranty scheme was encouraged were Southern California, Colorado, and Florida.

were able to make more money from poor surgical practices, as Allergan increased its percentage of the breast implant market despite Mentor's lower prices.

### The Clayman Practice

18.     Clayman Senior was first licensed as a medical doctor in Florida on January 10, 1975.   On December 31, 1976, he completed a residency in plastic surgery, and he began practicing in Jacksonville, Florida.   Soon after establishing the Clayman Practice, he began performing breast augmentation surgeries.   During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

19.     After the FDA prohibited the widespread use of silicone breast implants in 1992, Clayman Senior began using saline filled implants exclusively.

20.     As of the early 2000s, the Clayman Practice began marketing its breast augmentation practice to patients of modest means.   To reach this population, the Clayman Practice advertised extensively in free local discount publications.   Furthermore, the Clayman Practice began charging less for breast augmentations than other local plastic surgeon; while most plastic surgeons charged between $5,000 and $10,000, the Clayman Practice charged only $3,750.   As a result, the Clayman practice became a high-volume breast augmentation plastic surgery practice.

### Ricardo E. Mojica

21.     Between 2000 and 2006, Mojica worked as a surgical sales representative for Inamed/McGhan.   The products he sold were breast implants, facial implants, and injectable "fillers."

22.     In 2002, Mojica was promoted to the Southeast Team Field Trainer.

23.     In 2003, Mojica was named "sales representative of the year" by Inamed/McGhan for achieving $1,040,000 in sales, which was an increase of 37% from the previous year.

24.     After the merger with Allergan, Mojica was promoted to Southeast Regional Sales Director, for which his territories included Florida, Georgia, and South Carolina. Mojica held this position between 2006 and 2013. According to his personal LinkedIn profile, he was "responsible for leading and developing an elite 10-member sales team," of which he claimed the "foundation of our success was achieved through a collaborative and synergistic team culture." He also attributes his success as the Southeast Regional Sales Director to "helping team members achieve their individual goals and open collaboration channels to share effective practices."

25.     In reality, Mojica trained and directed his sales representatives to act in ways that previous managers had prohibited. Specifically, he trained and directed them to expressly offer Diamond tier APP partners non-educational parties and travel in exchange for increased implant purchases. He also trained and directed them to employ the breast implant warranty scheme (see paragraphs 14-17). Specifically, sales representatives were trained and directed to expressly offer Diamond tier partners free breast implants and surgical fees for false warranty claims in exchange for higher breast implant and other aesthetic product purchases.

26.     Soon after adopting these unethical and illegal sales practices, Allergan's breast implant sales volumes increased rapidly in Mojica's region, particularly in Florida, even though Mentor continued to offer lower prices on implants. As the volume of breast implant sales increased, the profit per pair of implants diminished, and the number of returned implants increased.

27.     In 2013, Mojica was promoted to Junior Director, Medical Education. In his new position with Allergan, Mojica was responsible for "building and leading a high-performing team responsible for development of the plastic surgery sales force and plastic surgeons." In this capacity, Mojica began training and directing sales representatives across the country to, among other things, employ the breast implant warranty scheme with Diamond tier partners.

### The Allergan/Mojica-Clayman Conspiracy

28.    Until the mid-2000s, the Clayman Practice purchased saline breast implants from Allergan's predecessor (Inamed/McGhan) *and Mentor*.  During this time, Clayman Senior began "covering up" his poor surgical practices by blaming post-augmentation complications on leaking, ruptured, or deflated implants.  Clayman Senior lied to his patients because he knew that by claiming that the implants were defective, he could divert blame for the complications away from himself.

29.    During a single year in the mid-2000s, the Clayman Practice made more than 40 warranty claims to Mentor.  In response, Mentor's quality assurance department contacted the regional sales manager and advised him that the high number of claims was indicative of fraud. Mentor asked the regional sales manager to meet with Clayman Senior and demand an explanation for the unusually high number of warranty claims.  Clayman Senior refused to meet with the sales manager.  As a result, Mentor permanently ended its relationship with the Clayman Practice, and Inamed/McGhan became the Clayman Practice's sole breast implant supplier.

30.    After Allergan acquired Inamed/McGhan in 2006, the company adopted the APP and installed Mojica as the Sales Director for the Southeast Region, which included Jacksonville, Florida.  Soon afterward, the Clayman Practice became a Diamond tier partner in the APP as a result of its high-volume purchases of Allergan aesthetic products such as Botox, Juvaderm, and Natrelle saline breast implants.

31.    After Mojica was promoted to Southeast Regional Sales Director, he became personally acquainted with Clayman Senior, his wife Elana Clayman, and Clayman Junior (who was still in his post-medical school training at the time).  Mojica and the Claymans even socialized together at national plastic surgery conferences outside of Jacksonville.  Mojica

expressly offered the Claymans the opportunity to participate in the breast implant warranty scheme. Mojica also directed his sales representatives to reiterate his offer to participate in the breast implant warranty scheme to the Claymans. With that, the Claymans had found in Allergan, Mojica, and his sales representatives partners willing to assist them in defrauding their patients. Thereafter, Allergan and the Claymans developed a symbiotic relationship built upon the mutual knowledge and understanding that the Claymans were lying to patients about the condition of their breast implants to receive free breast implants and surgical fees, in exchange for the Claymans' continued purchases of high volumes of Allergan's aesthetic products such as breast implants.

32.      Between 2006 and 2015 the Clayman Practice made the following warranty claims, for which Allergan made the following payments:

| Year | Warranty Claims | Warranty Payments to the Clayman Practice |
|------|-----------------|-------------------------------------------|
| 2006 | 84 | $  106,800 |
| 2007 | 76 | $  110,400 |
| 2008 | 150 | $  213,600 |
| 2009 | 261 | $  261,000 |
| 2010 | 521 | $  855,600 |
| 2011 | 866 | $1,420,000 |
| 2012 | 849 | $1,380,000 |
| 2013 | 798 | $1,330,000 |
| 2014 | 1,057 | $1,770,000 |
| 2015 | 616 | $1,090,000[4] |

---

[4]      The undersigned does not have records reflecting the number of breast implant warranty claims the Clayman Practice made to Allergan after 2015.

33.    To make a breast implant warranty claim, surgery practices were required to return "defective implants" to Allergan, where members of the product surveillance department performed what they called *Laboratory Analyses*, a series of tests designed to identify root causes of ruptures, deflations and leaks.  The product surveillance department would then generate *Laboratory Analysis* reports detailing their findings. [5]

34.    Nearly every *Laboratory Analysis* report for saline breast implants returned by the Clayman Practice found no evidence of a "loss of shell integrity, resulting in implant rupture or deflation," which was a requirement for payment under Allergan's warranty.  <u>Nevertheless, Allergan paid every warranty claim from the Clayman Practice between 2006 and 2015;</u> this amounted to **5,278 warranty claims for a total of $8,537,400 in payments**.

35.    Allergan's own studies of its saline breast implants showed a failure rate that was markedly lower than the failure rate experienced by the Clayman Practice.  According to this study, the failure rate for Allergan Natrelle saline breast implants was only 1.5% for each year after surgery.

36.    Allergan has had a deep financial motivation for paying the Clayman Practice's 5,278 warranty claims.  Between January 1, 2008 and December 31, 2015, the Clayman Practice purchased 11,082 pairs of saline breast implants from Allergan, which made the Clayman Practice one of Allergan's top 10 breast implant customers in Florida.  Furthermore, the Clayman Practice purchased a host of other aesthetic products from Allergan, including the following: Botox, Latisse, Juvederm, Kybella, SkinMedica, Vivate, and CoolSculpting (a product marketed by Zeltiq Aesthetics, which is a subsidiary of Allergan).  Since Allergan adopted the APP, the

---

[5]    One important reason the Allergan-Clayman conspiracy went undiscovered for so many years was that Allergan did not as a matter of course provide patients with copies of their *Laboratory Analysis* reports.

Clayman Practice has essentially become a "one supplier shop." When a nurse employed by the Clayman Practice asked Clayman Senior why he believed Allergan would keep paying his breast implant warranty claims, he told her, "I know they're going to pay them all because I'm a Diamond level partner."

37.     During this same time period, other plastic surgery practices that were not APP Diamond tier partners had their saline breast implant warranty claims denied by Allergan, even though they made fewer than 5 warranty claims per year.

38.     Furthermore, to the best of the undersigned's information and belief, Allergan has devised an "off-balance-sheet" method of paying breast implant warranty claims. Specifically, Allergan pays breast implant warranty claims through a captive insurance company created and owned by Allergan.[6] When a manufacturer such as Allergan creates a captive insurance company, the manufacturer is provided a means of reclassifying otherwise taxable income from across its various divisions and subsidiaries as "premium payments" that go to the captive insurance company. The formerly taxable income that is reclassified as "premiums" then accumulates within the captive, making it, essentially, a large "slush fund." In the event the manufacturer uses the captive insurance company to pay a "loss," such as a breast implant warranty payment, the loss is not reflected in the manufacturer's balance sheets or filings with the Securities and Exchange Commission. In addition, because the captive is not a third-party company, manufacturers with captive insurance companies are free to manipulate the claims process without outside interference.

39.     In earlier related lawsuits filed against Allergan, Clayman Senior, Clayman Junior, and Elana Clayman were each served a subpoena for a video deposition, which took

---

[6]     *See*, https://opencorporates.com/companies/us_hi/206243D1.

place on December 4, 2018. In each of these depositions, when asked about their possible involvement in the Allergan breast implant warranty scheme, the Claymans refused to answer and invoked their Fifth Amendment rights against criminal self-incrimination.

**Allergan's Similar Course of Conduct Across Other Divisions**

40.     The breast implant warranty scheme is not the first instance in which Allergan has been implicated in a physician bribery scheme, as Allergan has been implicated in violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), <u>at least six times, resulting in Allergan paying a total of $1.089 billion</u> in criminal penalties and civil settlements.

41.     The federal Anti-Kickback Statute prohibits anyone from

knowingly and willfully offer[ing] or pay[ing] remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

…

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[7]…

42 U.S.C. §1320a-7b(b)(2).

42.     Over the past ten years, Allergan was involved in the following:

A.     **September 1, 2010**, Allergan was forced to pay $600 million in settlement of criminal and civil complaints that included allegations of providing free physician workshops and dinners, paying physicians to attend "advisory boards" promoting off-

---

[7]     Because the Clayman Practice's patients paid for their breast augmentation procedures with cash (not under a Federal health care program), the Anti-Kickback Statute does not apply to the Clayman scheme, and Plaintiffs assert no claim under the Anti-Kickback Statute. Plaintiffs, however, allege the facts concerning Allergan's conduct in violation of the Anti-Kickback Statute to show this Court that it is plausible that Allergan, consistent with its past criminal conduct, engaged here in criminal conduct by conspiring with, and substantially assisting, the Clayman Practice to perpetrate fraud upon its patients.

label uses, and created Alphamedica, which administered a speakers bureau that paid physicians $1,000 to allow sales representatives to shadow them at work.[8]

B. **September 15, 2010**, Allergan's Forest Laboratories division was forced to pay a $313 million settlement of criminal and civil complaints that included allegations of cash payments to physicians that the company described as "grants" and "consulting fees," expensive meals, and lavish entertainment to physicians to induce them to prescribe the drugs Celexa and Lexapro.[9]

C. **October 29, 2015**, Allergan's Warner Chilcott division was forced to pay a $125 million settlement in a case that included allegations of violations of paying doctors speaLe fees to induce them to prescribe the drugs Asacol, Actonel, and Loestrin.[10]

D. **December 15, 2016**, Allergan's Forest Laboratories division was forced to pay a $38 million settlement in a case that included allegations of paying kickbacks to physicians to induce them to prescribe the drugs Bystolic, Savella, and Namenda.[11]

E. **June 29, 2017**, Allergan was forced to pay a $13 million settlement in a case involving allegations of providing valuable business consulting services, continuing medical education, and other valuable services to physicians to induce them to prescribe

---

[8]     *See*,     https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox;     https://www.cbsnews.com/news/how-allergan-sponsored-a-history-of-sausages-to-promote-botox-illegally/.

[9]     *See*,     https://www.justice.gov/opa/pr/drug-maker-forest-pleads-guilty-pay-more-313-million-resolve-criminal-charges-and-false.

[10]     *See*, https://www.wsj.com/articles/allergan-unit-to-plead-guilty-to-fraud-pay-125-million-1446139657/?mod=mktw.

[11]     *See*,     https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations.

Allergan eye care products including Restasis, when other less expensive treatment alternatives were available.[12]

43.    Allergan's previous conduct demonstrates that its involvement in the breast implant warranty scheme was and is part of a larger course of conduct whereby the company's marketing plan includes bribing physicians to increase sales.

### Brenda L. Landon

44.    Ms. Landon first sought a consultation for a breast augmentation with Clayman Senior on January 26, 2012.  Ms. Landon reported that she was unhappy with her breasts because they sagged and were too small.  She told him she was interested in implants and a lift procedure. After very briefly examining her, Clayman Senior recommended a breast augmentation with saline breast implants; he recommended against a mastopexy because he claimed it would create too much scarring.  She agreed to proceed for the cost of $3,750.

45.    On February 22, 2012, Ms. Landon presented to the Clayman Practice for the recommended breast surgery.   During this procedure, Clayman Senior implanted Allergan Natrelle Style 68 High Profile 320cc saline implants into her breasts.  Clayman Senior failed to document the amount of saline he used to inflate her implants.

46.    On May 29, 2012, Ms. Landon returned to the Clayman Practice and reported to Clayman Senior that her breasts were different sizes, and that she wanted both breasts to be larger.   After performing a brief examination, Clayman Senior told her that she had a right deflation, and that she needed to have both implants removed and replaced.  On that same date, Clayman Senior and/or Clayman Practice staff gave Ms. Landon a written surgical estimate that

---

[12]    *See*, http://www.pietragallo.com/library/files/nevyas_allergan_press_release_final.pdf.

stated she had a "Right deflation," that she needed to have a "Bilateral Replace & Crescentpexy," and that "Co. will supply."

47.    On June 4, 2012, Ms. Landon returned to the Clayman Practice for her second breast surgery. In the surgical intake forms Ms. Landon wrote that she wanted her breasts to "be larger and more even." Clayman Senior and/or Clayman Practice staff had her sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "Right deflation," for which she would be undergoing a "Bilateral Replace & crescentpexy." A preoperative photograph taken that day of her breasts demonstrates that she did not have a rupture, deflation, or leak at either of her breast implants, although she had asymmetry and ptosis.

48.    According to the Operative Report and OR Record (both dated June 4, 2012), her preoperative diagnosis was "Right deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the right, the implant was removed and "found to have tissue in and around the implant valve and fill channel, but the leak the patient was sure occurring was not apparent on exam." Clayman Senior further documented that the implant was weighed "via archimides-principle," and he documented that there were 50cc of saline less in the implant "than placed at initial operation." Significantly, Clayman Senior failed to document the amount of saline he used to inflate the implants in the previous surgery. The left implant was found to be intact, but it was also removed. Both implants were replaced with Allergan Natrelle High Profile 350cc saline implants which he documented overfilling with 400 cc's in both.

49.    On or about June 4, 2012, Clayman Senior and/or Clayman Practice staff had Ms. Landon sign an Allergan breast implant warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her right implant, and that as a result, she was required to undergo

surgery to remove and replace both implants. The Claymans sent the removed implants and the completed warranty claim forms to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory. After conducting analysis of the implant, the Device Analysis Laboratory found no basis for the claimed rupture, deflation, or leak. Nevertheless, the Clayman Practice received a warranty claim check from Allergan for $1,200 on or about July 30, 2012.

50.     On October 17, 2012, Ms. Landon returned to the Clayman Practice and reported to Clayman Senior that she wanted to "go bigger." After performing a very brief examination, Clayman Senior told Ms. Landon that it "looked like her left implant could be leaking," and that he would have to "fix it." He recommended that she have both implants removed and replaced, and that the replacement implants have greater volume so they would be "higher & rounder."

51.     On October 22, 2012, Ms. Landon returned to the Clayman Practice for her third breast surgery. In the surgical intake forms Ms. Landon wrote that her breasts "Sag," that "one seems larger," and that she wanted her breasts to be "a little bigger." Clayman Senior and/or Clayman Practice staff had her sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "left deflation," and that she needed to undergo "Bilateral Replace" and an "Internal lift." A preoperative photograph taken that date of her breasts demonstrates that she did not have a rupture, deflation, or leak at either of her breasts.

52.     According to the Operative Report and OR Record (both of which were dated October 22, 2012), her preoperative diagnosis was "Left deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the left, the implant was removed, and "tissue within the valve was identified with a partial deflation." Once again, Clayman Senior documented that the "implant was weighed and [there were] approximately 50cc's less than placed at the time of surgery." The right breast implant was

16

found to be intact, but it was also removed.  Both implants were replaced with Allergan Natrelle Style 68 Medium Profile 360cc saline implants which he overinflated with 480 cc's of saline in each.

53.     On or about October 22, 2012, Clayman Senior and/or Clayman Practice staff had Ms. Landon sign an Allergan breast implant warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her left implant, and that as a result, she was required to undergo surgery to remove and replace both implants.  The Claymans sent the removed implants and the completed warranty claim forms to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory.  After conducting analysis of the implant, the Device Analysis Laboratory found no basis for the claimed rupture, deflation, or leak.  Nevertheless, the Clayman Practice received a warranty claim check from Allergan for $1,200 on or about February 6, 2013.

54.     On March 6, 2013, Ms. Landon returned to the Clayman Practice with complaints that her breasts seemed to be the same size that they were before her surgery on October 22, 2012.  She asked Clayman Senior if she could "go bigger."  After a brief examination, Clayman Senior told her that she had a deflation at her right implant, and that she needed surgery to remove and replace both of her implants.  That same date, Clayman Senior and/or Clayman Practice staff gave her a written surgical estimate that stated that her "Right [was] smaller," and that she needed a "Bilateral Replacement" that "Co. will supply."

55.     On April 22, 2013, Ms. Landon returned to the Clayman Practice for her fourth breast surgery.  In the surgical intake forms Ms. Landon wrote that her breasts "Sag," were too "far apart," a "little to[o] small," and that "Right seems smaller and lower than left."  Clayman Senior and/or Clayman Practice staff had her sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "Right Deflation," and that she needed to

undergo "Bilateral Replace" with "Larger" implants. A preoperative photograph taken of her breasts that date demonstrates that she did not have a rupture, deflation, or leak at either of her breasts.

56.     According to the Operative Report and OR Record (both of which were dated April 22, 2013), her preoperative diagnosis was "Right deflation." Clayman Senior further documented in the Operative Report that he dissected down to the implant capsule on the right, and that "[o]nce the pocket was entered, a small amount of fluid was encountered and the implant was found to be leaking at the valve." The implant was removed and "it appeared tht the breast was involved in some type of injury, as the internal tightening sutures with capsule plication were torn and there was some liquefied blood present with a partial deflation, as there was still quite a bit of volume within the implant." The left breast implant was found to be intact, but it was also removed. Both implants were replaced with Allergan Natrelle Style 68 Medium Profile 360cc saline implants. Clayman Senior failed to document the amount of saline he used to inflate the new implants.

57.     Even though Allergan's warranty does not cover ruptures, deflations, or leaks that occur due to trauma, on or about April 22, 2013, Clayman Senior and/or Clayman Practice staff had Ms. Landon sign an Allergan breast implant warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her right implant, and that as a result, she was required to undergo surgery to remove and replace both implants. The Claymans sent the removed implants and the completed warranty claim forms to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory. After conducting analysis of the implant, the Device Analysis Laboratory found no basis for the claimed rupture, deflation, or leak. Nevertheless, the Clayman Practice received a warranty claim check from Allergan for $1,200 for the returned implants.

58.     On February 24, 2014, Ms. Landon returned to the Clayman Practice with complaints that her right breast had changed and was smaller than her left breast.  After a brief examination, Clayman Senior told her that she had a deflation at her right implant, and that she needed surgery to remove and replace both of her implants.

59.     On March 3, 2014, Ms. Landon returned to the Clayman Practice for her fifth breast surgery.  In the surgical intake forms Ms. Landon wrote that her breasts were too "far apart," that they "sag[ged]," and that they were the too small.  A preoperative photograph taken of her breasts that date demonstrates that she did not have a rupture, deflation, or leak at either of her breasts, but that her breasts were overinflated and sagging.

60.     According to the OR Record dated March 3, 2014, her preoperative diagnosis was "R. deflation."  Clayman Senior further documented in the Operative Report dated March 3, 2014 that upon dissecting down to the implant capsule on the right, and implant was removed and "found to have a partial deflation, with blood stained tissue within the fill channel and the internal plication was observed again to be torn, suspicious of an injury of some sort to the area."  He further documented that he measured the volume of the right implant, and found that "less than 75 cc's had leaked."  The left breast implant was found to be intact, but it was also removed.  Both implants were replaced with Allergan Natrelle Style 68 Medium Profile 420cc saline implants.  Clayman Senior documented overfilling both implants with 560 cc's of saline.

61.     On or about March 3, 2014, Clayman Senior and/or Clayman Practice staff had Ms. Landon sign an Allergan breast implant warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her right implant, and that as a result, she was required to undergo surgery to remove and replace both implants.  The Claymans sent the removed implants and the completed warranty claim forms to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory.  After conducting analysis of

the right implant, the Device Analysis Laboratory found no basis for the claimed rupture, deflation, or leak.  Nevertheless, on May 1, 2014 the Clayman Practice received a warranty claim check for $1,200 from Allergan for the returned implants.

62.     On August 13, 2014, Ms. Landon returned to the Clayman Practice and reported to Clayman Senior that her "left Breast seems smaller."   After a brief examination, Clayman Senior told her that she needed to have another surgery so he could add saline to both of her implants.

63.     On September 3, 2014, Ms. Landon presented to the Clayman Practice for her sixth breast surgery.  Clayman Senior documented in the Operative Report of September 3, 2014 that he added 40 cc's of saline to the right implant and 80 cc's of saline to the left implant.

64.     On December 28, 2016, Ms. Landon was examined by a different plastic surgeon who recommended bilateral removal of her overfilled saline implants, and replacement with new silicone filled implants, as well as a mastopexy; the anticipated cost for these procedures is $8,700.

65.     Since the last surgery with Clayman Senior, Ms. Landon's areolae are stretched and disfigured; her breasts have significant ptosis; and she has had to wear a bra at all times.

### COUNT I – ALLERGAN AND MOJICA AIDING AND ABETTING
### THE CLAYMANS' BREACH OF FIDUCIARY DUTY AND/OR FRAUD

66.     Ms. Landon re-alleges and incorporates by reference paragraphs 1 through 65.

67.     Throughout the care and treatment of Ms. Landon, the Claymans breached their fiduciary duty to her by:

(a).     Repeatedly claiming that one of her breast implants had ruptured, deflated, or leaked when it had not.

(b).    Performing revision surgeries on June 4, 2012; October 22, 2012; April 22, 2013; and March 3, 2014, based upon alleged spontaneous implant ruptures, deflations, or leaks that did not exist, which placed her at increased risk for surgical and anesthetic complications, and which involved simply repeating the same procedure that was previously performed.

(c).    Not performing the surgery that her physical condition actually required, in favor of surgery that took less time and skill, to allow for the removal and replacement of saline implants under Allergan's Warranty.

68.    On one or more of the below occasions, the Claymans made the following false statements or representations, which were intended to conceal their financial and other personal motivations in connection with the removal and replacement of allegedly ruptured, deflated, or leaking Allergan Natrelle saline implants, and which in fact misled Ms. Landon and/or others, and/or caused her to respond in the following ways to her detriment:

(a).    On May 29, 2012, Clayman Senior told Ms. Landon that she right deflation, and that she needed surgery to remove and replace both implants.  In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.  This representation caused Ms. Landon to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

21

(b).    On May 29, 2012, Clayman Senior and/or Clayman Practice staff gave Ms. Landon a written surgical estimate that stated she had a "Right deflation," and that she needed to have a "Bilateral Replace & Crescentpexy."  In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.  This representation caused Ms. Landon to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(c).    On June 4, 2012, Clayman Senior and/or Clayman Practice staff had Ms. Landon sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "Right deflation," for which she would be undergoing a "Bilateral Replace and crescentpexy."  In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.  This representation caused Ms. Landon to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(d).     In the Operative Report and OR Record (both dated June 4, 2012), Clayman Senior represented to Ms. Landon and others that her preoperative diagnosis was "Right deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the right, the implant was removed and "found to have tissue in and around the implant valve and fill channel, but the leak the patient was sure occurring was not apparent on exam." Clayman Senior further documented that the implant was weighed "via archimides-principle," and he documented that there were 50cc of saline less in the implant "than placed at initial operation." In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems she was having with her breasts. These representations caused Ms. Landon and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(e).     On or about June 4, 2012, the Claymans made a warranty claim to Allergan regarding the right breast implant removed on June 4, 2012. Specifically, the Claymans had Ms. Landon sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her right breast implant, for which she needed a removal and replacement procedure for both implants. By having Ms. Landon sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced. In fact, Ms.

23

Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Landon and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(f).    On October 17, 2012, Clayman Senior told Ms. Landon that it "looked like her left implant could be leaking, and that he would have to "fix it." In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts. This representation caused Ms. Landon to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(g).    On October 22, 2012, Clayman Senior and/or Clayman Practice staff had Ms. Landon sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "left deflation," for which she would be undergoing a "Bilateral Replace" and an "Internal lift." In fact, Ms. Landon did not have a

spontaneous rupture, deflation, or leak at either of her breast implants, nor is there a recognized surgical procedure known as an "internal lift," and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts. These representations caused Ms. Landon to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(h).    In the Operative Report and OR Record (both of which were dated October 22, 2012), Clayman Senior represented to Ms. Landon and others that her preoperative diagnosis was "Left deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the left, the implant was removed and "tissue within the valve was identified with a partial deflation," and that left implant was weighed, and that there were approximately 50 cc's less than he had put in at the time of the previous surgery. In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems she was having with her breasts. These representations caused Ms. Landon and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from

another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(i).    On or about October 22, 2012, the Claymans made a warranty claim to Allergan regarding the left breast implant removed on October 22, 2012. Specifically, the Claymans had Ms. Landon sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her left breast implant, for which she needed a removal and replacement procedure for both implants. By having Ms. Landon sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced. In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Landon and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(j).    On March 6, 2013, Clayman Senior told Ms. Landon that she had a deflation at her right breast implant, and that she needed surgery to remove and replace both of her implants. In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts. This representation caused Ms. Landon to conclude that the problems she was experiencing with her breasts were the

result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(k).    On April 22, 2013, Clayman Senior and/or Clayman Practice staff had Ms. Landon sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "Right Deflation," for which she would be undergoing a "Bilateral Replace." In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts. These representations caused Ms. Landon to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(l).    In the Operative Report and OR Record (both of which were dated April 22, 2013), Clayman Senior represented to Ms. Landon and others that her preoperative diagnosis was "Right deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the right and entering the pocket, a "small amount of fluid was encountered and the implant was found to be leaking at the valve." The implant was removed and "it appeared tht the breast was involved in some type of injury, as the internal tightening sutures with capsule plication

27

were torn and there was some liquefied blood present with a partial deflation, as there was still quite a bit of volume within the implant." In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems she was having with her breasts. These representations caused Ms. Landon and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(m). On or about April 22, 2013, the Claymans made a warranty claim to Allergan regarding the right breast implant removed on April 22, 2013. Specifically, the Claymans had Ms. Landon sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her right breast implant, for which she needed a removal and replacement procedure for both implants. By having Ms. Landon sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced. In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Landon and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a

different plastic surgeon.  As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(n).    On February 24, 2014, Clayman Senior told Ms. Landon that she had a deflation at her right implant, and that she needed surgery to remove and replace both implants.  In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.  This representation caused Ms. Landon to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(o).    In the OR Record dated March 3, 2014, Clayman Senior represented to Ms. Landon and others that her preoperative diagnosis was "R. deflation."  Clayman Senior further documented in the Operative Report dated March 3, 2014 that upon dissecting down to the implant capsule on the right, the implant was removed and "found to have a partial deflation, with blood stained tissue within the fill channel and the internal plication was observed again to be torn, suspicious of an injury of some sort to the area."  He further documented that he measured the volume of the right implant, and fount that "less than 75 cc's had leaked."  In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems she was having with her breasts.

These representations caused Ms. Landon and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(p).    On or about March 3, 2014, the Claymans made a warranty claim to Allergan regarding the right breast implant removed on March 3, 2014. Specifically, the Claymans had Ms. Landon sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her right breast implant, for which she needed a removal and replacement procedure for both implants. By having Ms. Landon sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced. In fact, Ms. Landon did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Landon and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Landon did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

69.    For the previously stated reasons in paragraphs 30 through 39 above, Allergan and Mojica knew that the Claymans were breaching a fiduciary duty owed to Ms. Landon, and/or

committing fraud upon her. Despite this knowledge, Allergan and Mojica provided substantial assistance to the Claymans in committing fraud against Ms. Landon, and/or breaching a fiduciary duty owed to her, in one or more of the following ways:

(a).    Continuing to sell saline breast implants to the Claymans while Ms. Landon was a patient of the Claymans; and

(b).    Ensuring and making payment of the warranty claim of the Claymans in relation to the saline implants that Clayman Senior surgically removed from Ms. Landon on June 4, 2012; October 22, 2012; April 22, 2014; and March 3, 2014.

70.    As a direct and proximate result of the substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Landon suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

71.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Landon has spent monies in the amount of $3,750 or more, for medical and/or surgical care by the Claymans that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **BRENDA L. LANDON**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT II – ALLERGAN, MOJICA, AND THE CLAYMANS' CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY AND/OR FRAUD

72.     Ms. Landon re-alleges and incorporates by reference paragraphs 1 through 65, 67, and 68.

73.     On or before January 26, 2012, Allergan, Mojica, and the Claymans entered into an agreement to commit one or more breaches of a fiduciary duty and/or fraud in relation to the Claymans' patients.  The acts and conduct illustrative of the parties' intent to enter into this agreement are alleged in paragraphs 30 through 39 above.  Furthermore, Mojica had a personal stake in the activities of the conspiracy that was separate from Allergan's interests in the conspiracy, i.e. his personal advancement within the company and individual incentive pay and/or commissions.

74.     Allergan and Mojica committed one or more of the following overt acts in furtherance of the conspiracy to breach a fiduciary duty and/or to commit fraud:

(a).     Continuing to sell saline breast implants to the Claymans while Ms. Landon was a patient of the Claymans; and

(b).     Ensuring and making payment of the warranty claim of the Claymans in relation to the saline implants that Clayman Senior surgically removed from Ms. Landon on June 4, 2012; October 22, 2012; April 22, 2014; and March 3, 2014.

75.     As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty, Ms. Landon suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

76.    Furthermore, as a direct and proximate result of the above noted conspiracy to breach a fiduciary duty and/or to commit fraud, Ms. Landon has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **BRENDA L. LANDON**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – FLORIDA CIVIL RICO AND REMEDIES
## FOR CRIMINAL ACTIVITIES – CONSPIRACY

77.    Ms. Landon re-alleges and incorporates by reference paragraphs 1 through 65, 67, 68, 73, and 74.

78.    Allergan and Mojica violated sections 772.103(4) and 895.04(4), *Florida Statutes*, by conspiring with the Claymans to violate sections 772.103(3) and 895.03(3), respectively.

79.    In connection with the fraudulent scheme, Allergan, Mojica, and the Claymans agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity.

80.    Allergan, Mojica, and the Claymans agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two acts of criminal and racketeering activity.

81.    The predicate acts of Allergan, Mojica, and/or the Claymans began at an unknown date, and involved hundreds of the Claymans' breast implant patients.

82.     The predicate acts of Allergan, Mojica, and/or the Claymans continued to occur against the Claymans' breast implant patients at least until October 26, 2017.

83.     As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Landon suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

84.     Furthermore, as a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Landon has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

85.     Despite her diligence and efforts, Ms. Landon's discovery of these ongoing injuries was delayed by Allergan, Mojica, and/or the Claymans' fraudulent concealment activity.

86.     As a result of the foregoing, Ms. Landon has had to hire the undersigned attorney and his law firm, and has agreed to pay him/them a reasonable fee for his/their services.

87.     Pursuant to Section 772.104, *Florida Statutes*, Ms. Landon is entitled to recover treble damages plus costs and attorney's fees from Allergan and Mojica.

WHEREFORE, the Plaintiff, **BRENDA L. LANDON**, pursuant to Section 895.05, *Florida Statutes*, demands judgment for treble actual and consequential damages arising from the conduct of the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, an award of costs and all reasonable attorneys' fees, and the following additional remedies:

A.      A preliminary injunction prohibiting similar conduct by the Defendants in the

State of Florida;

      B.     A permanent injunction prohibiting similar conduct by the Defendants in the State of Florida;

      C.     Revocation of the certificate authorizing the Defendant, **ALLERGAN SALES, LLC**, to do business in the State of Florida;

      D.     Forfeiture of all monies and real and personal property received or obtained by the Defendants as a result of the acts alleged in this Count, and the Plaintiff, **BRENDA L. LANDON**, will have a claim for any and all such forfeited monies and real and personal property;

      E.     A civil penalty against the Defendant, **RICARDO E. MOJICA**, in the amount of $100,000;

      F.     A civil penalty against the Defendant, **ALLERGAN SALES, LLC,** in the amount of $1,000,000; and

      G.     Any further relief the Court deems just and proper.

### COUNT IV - LOSS OF CONSORTIUM

88.     Mr. Landon re-alleges and incorporates by reference paragraphs 1 through 87.

89.     At all relevant times, Mr. Landon was and is the lawful wedded husband of Ms. Landon, and did and does reside with her.

90.     As a direct and proximate result of the above described wrongful conduct of Allergan and Mojica, Mr. Landon has lost the care, comfort, and companionship of Ms. Landon, and he will suffer these losses in the future.

WHEREFORE, the Plaintiff, **RESTITUTO A. LANDON,** demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA,** together with the costs of this action, and the Plaintiff respectfully demands a trial by

jury on all issues so triable.

Dated this 22th day of May, 2020.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:     (904) 632-2424
Facsimile:     (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiffs